IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-134

No. 20PA21

Filed 16 December 2022

RADIATOR SPECIALITY COMPANY

v.

ARROWOOD INDEMNITY COMPANY (as successor to GUARANTY NATIONAL INSURANCE COMPANY, ROYAL INDEMNITY COMPANY, and ROYAL INDEMNITY COMPANY OF AMERICA); COLUMBIA CASUALTY COMPANY; CONTINENTAL CASUALTY COMPANY; FIREMAN'S FUND INSURANCE COMPANY; INSURANCE COMPANY OF NORTH AMERICA; LANDMARK AMERICAN INSURANCE COMPANY; MUNICH REINSURANCE AMERICA, INC. (as successor to AMERICAN REINSURANCE COMPANY); MUTUAL FIRE, MARINE AND INLAND INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; PACIFIC EMPLOYERS INSURANCE COMPANY; ST. PAUL SURPLUS LINES INSURANCE COMPANY; SIRIUS AMERICA INSURANCE COMPANY (as successor to IMPERIAL CASUALTY AND INDEMNITY COMPANY); UNITED NATIONAL INSURANCE COMPANY; WESTCHESTER FIRE INSURANCE COMPANY; ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS

On discretionary view pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, No. COA19-507, 2020 WL 7039144 (N.C. Ct. App. Dec. 1, 2020), reversing in part and affirming in part a judgment entered on 27 February 2019 by Judge W. David Lee in Superior Court, Mecklenburg County. On 10 August 2021, the Supreme Court allowed defendant Fireman's Fund Insurance Company's cross-petition for discretionary review and Landmark American Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA's conditional petition for discretionary review. Heard in the Supreme Court on 30 August 2022.

*McGuireWoods LLP, by Bradley R. Kutrow; and Perkins Coie LLP, by, Jonathan G. Hardin and Catherine J. Del Prete, for plaintiff-appellant.*

*Fox Rothschild LLP, by Matthew Nis Leerberg and Troy D. Shelton; and Rivkin Radler LLP, by Michael A. Kotula, for defendant-appellant Fireman's Fund Insurance Company.*

*Goldberg Segalla LLP, by David L. Brown and Allegra A. Sinclair; and Nicolaides Fink Thorpe Michaelides Sullivan LLP, by Matthew J. Fink, pro hac vice, and Mark J. Sobczak, pro hac vice, for defendant-appellee National Union Fire Insurance Company of Pittsburgh, PA.*

*Hedrick Gardner Kincheloe & Garofalo, LLP, by M. Duane Jones and Paul C. Lawrence; and Musick, Peeler & Garrett LLP, by David A. Tartaglio, Stephen M. Green, and Steven T. Adams, for defendant-appellee Landmark American Insurance Company.*

*Robinson, Bradshaw & Hinson, P.A., by R. Steven DeGeorge, for United Policyholders, amicus curiae.*

*Cranfill Sumner LLP, by Jennifer A. Welch; and Crowell & Moring, by Laura Foggan for Complex Insurance Claims Litigation Association and American Property Casualty Insurance Association, amici curiae.*

EARLS, Justice.

Radiator Specialty Company (RSC) is a North Carolina-based manufacturer of automotive, hardware, and plumbing products, including cleaners, degreasers, and lubricants. Some of the products RSC has manufactured contained benzene. Over the past twenty years, RSC has been named in hundreds of personal injury lawsuits seeking damages for bodily injury allegedly caused by repeated exposure to benzene over time. During that same period, RSC purchased more than one-hundred

standard-form product liability policies from twenty-five insurers, including the three

insurers remaining in this action: Fireman's Fund Insurance Company (Fireman's

Fund), Landmark American Insurance Company (Landmark), and National Union

Fire Insurance Company of Pittsburgh, PA (National Union) [collectively, the

insurers]. RSC now seeks compensation from those insurers for liabilities it has

incurred as a result of its benzene litigation.

¶ 2        This case presents a challenge that is unique from personal injury cases in

which the injury occurs at a definite time and place. Unlike a car crash, for example,

where the injury takes place on a clearly discernable date, benzene exposure may

take place over the course of several years, spanning multiple insurance-policy

periods and implicating different providers. More complicated still, the consequences

of that exposure may not become apparent for even longer. As a result, as the courts

of New York have stated,

> [c]ourts across the country have grappled with so-called
> "long-tail" claims—such as those seeking to recover for
> personal injuries due to toxic exposure and property
> damage resulting from gradual or continuing
> environmental contaminations—in the insurance context.
> These types of claims present unique complications
> because they often involve exposure to an injury-inducing
> harm over the course of multiple policy periods, spawning
> litigation over which policies are triggered in the first
> instance, how liability should be allocated among triggered
> policies and the respective insurers, and at what point
> insureds may turn to excess insurance for coverage.

*In re Viking Pump, Inc.*, 27 N.Y.3d 244, 255 (2016).

¶ 3 This dispute concerns which insurers are obligated to pay which costs arising from RSC's benzene liabilities pursuant to the terms of the insurers' liability insurance policies. To answer this question, we must decide as a matter of law (1) when each insurer's coverage is triggered in these circumstances—that is, whether coverage is triggered when a claimant is exposed to benzene, or instead, when the claimant develops observable bodily injury, such as sickness or disease (exposure vs. injury-in-fact); (2) how defense and indemnification costs are allocated among insurers when multiple policies in multiple years are triggered by the same claim (all sums vs. pro rata); and (3) what underlying limits RSC must exhaust before seeking defense coverage from umbrella or excess policies (vertical vs. horizontal exhaustion).

## I.    Background

### A. Factual Background

¶ 4 For over forty years, RSC produced and sold benzene-containing products, including a penetrating oil called Liquid Wrench. In the early 2000s, RSC became the subject of hundreds of personal injury lawsuits arising from its use of benzene in its products. Claimants sought damages for consequences they have suffered as a result of benzene exposure, including cancer and death. Their claims represent what are known as long-tail claims: allegations of injury spanning over the course of years. In other words, many of the claimants assert that they were exposed to RSC's benzene-containing products for years or decades, eventually developing progressive diseases.

As a result of this litigation, RSC has faced approximately $45 million in defense and settlement costs. RSC has sought to have some of those costs covered by a multitude of insurance policies it purchased over several decades from different providers. Fireman's Fund, Landmark, and National Union are the only such insurers that are parties to this appeal.

¶ 5        From 1971 to 2014, RSC purchased over one-hundred standard-form product liability policies from more than a dozen insurers. Most of these policies provided coverage for one year. In 2013, RSC brought suit against its insurance providers seeking coverage for the damages it has paid out of pocket related to its benzene litigation. Though RSC argues that the trial court erroneously "awarded [it] only a tiny fraction of the insurance for which RSC paid more than $7.1 million in premiums," the insurers reject the notion that RSC has not been awarded the amount it is due under the policies they issued, including because "[RSC] settled with certain insurers, purchased policies with high per claim self-insured retentions or deductibles, lost some policies it bought, or bought no applicable coverage at all." To cover for those "gaps in its insurance program," the insurers argue that RSC now seeks to hold them responsible for liabilities they were never obligated to cover.

**B. Procedural History**

¶ 6        On 6 February 2013, RSC filed a declaratory judgment action pursuant to N.C.G.S. § 1-253 *et seq.* seeking a declaration of the duties and obligations of fifteen

different defendant-insurers under policies they sold to RSC between 1971 and 2012.

¶ 7 An amended complaint filed with leave of the trial court on 5 July 2015 named nine of the original defendant insurance companies or successors in interest to the insurance companies that sold RSC primary and excess liability policies for the same period. The amended complaint raised additional claims for bad faith refusal to settle or pay and unfair or deceptive trade practices against National Union. Shortly thereafter, defendants filed both answers and motions for summary judgment on various issues of insurance contract interpretation.

¶ 8 On 28 and 29 January 2016, Judge W. David Lee issued orders addressing the issues raised in the summary judgment motions. In its Order on Trigger of Coverage, the trial court determined that "the exposure trigger is appropriate in the context of long tail bodily injury claims," meaning that "[t]he beginning of the triggered policy period is the date on which the claimant was first exposed to benzene" and "[t]he end of the triggered policy period is the date on which the claimant was last exposed to benzene."

¶ 9 In its Order Regarding Allocation, the trial court determined that "pro rata allocation applies to both defense and indemnity payments based on each insurer's 'time on the risk' over the RSC coverage block," rejecting the "all sums" approach and making RSC "responsible for its pro rata share of defense and indemnity costs where there has been settled, insolvent or lost policies, as well as periods where RSC was

uninsured, underinsured or self-insured."

¶ 10      In its Order on Landmark's Motion for Summary Judgment [Order on Exhaustion], the trial court determined that vertical exhaustion applies to the duty to indemnify under Landmark's umbrella policy but horizontal exhaustion applies to Landmark's duty to defend.

¶ 11      After issuing the summary judgment orders, the case proceeded to a bench trial in June 2018 for determination of the date of exposure for any claimants for whom the exposure date was disputed.

¶ 12      After a bench trial, the trial court entered an order of final judgment, determining that the insurers were obligated to defend and indemnify RSC under their policies "subject to their respective policy limits and the following rulings of this [c]ourt," including the "Order Regarding Allocation." The court incorporated by reference a Sealed Order for Declaratory Relief entered on 22 February 2019 assigning past defense and indemnity costs to the insurers by applying pro rata allocation. As a result, the insurers were required to reimburse $1.8 million of RSC's past costs.

¶ 13      In an unpublished opinion, a unanimous panel of the Court of Appeals affirmed the judgment of the trial court and dismissed in part. *Radiator Specialty Co. v. Arrowood Indem. Co.,* No. COA19-507, 2020 WL 7039144 (N.C. Ct. App. Dec. 1, 2020).

¶ 14      First, the Court of Appeals held that the trial court appropriately applied an

exposure theory for when coverage was triggered as opposed to an injury-in-fact theory. *Radiator Specialty Co.*, 2020 WL 7039144, at *3. According to the court, it was undisputed that

> the policies issued by defendants were standard-form policies with materially identical language on the issue of when coverage triggers. These policies provided that the insurer would pay "all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . caused by an occurrence[.]" The policies generally define "bodily injury" as injury, sickness, or disease sustained by a person, and "occurrence" as an accident including exposure.

*Id.* (alterations in original). The court rejected RSC's argument that this Court's decision in *Gaston County Dyeing Machine Co. v. Northfield Insurance Co.*, 351 N.C. 293 (2000), established that an injury-in-fact trigger applied to all standard-form policies. *Radiator Specialty Co.*, 2020 WL 7039144, at *3. Instead, the court noted that application of an injury-in-fact trigger in *Gaston*, a case involving property damage caused by a ruptured pressure vessel, "was premised upon the notion that a court could determine that 'an injury-in-fact occurs on a date certain and all subsequent damages flow from the single event.' " *Id.* (quoting *Gaston*, 351 N.C. at 304). By contrast, the court took "judicial notice of the innumerable cases concerning asbestos and benzene exposure and recognize[d] how difficult it is to ascribe a 'date certain' or 'single event' to such harm." *Id.* Accordingly, the court concluded that because "[i]njury resulting from benzene or asbestos exposure is neither discrete nor

so certain . . . [r]eading the contract language and interpreting it by its terms, it seems clear that a 'bodily injury' is something caused by an 'occurrence,' which can include exposure," and thus that "the trial court did not err in applying an exposure theory of coverage instead of injury-in-fact." *Radiator Specialty Co.*, 2020 WL 7039144, at \*4 (citing *Imperial Cas. & Indem. Co. v. Radiator Specialty Co.*, 862 F. Supp. 1437 (E.D.N.C. 1994), *aff'd*, 67 F.3d 534 (4th Cir. 1995)).

¶ 15        Second, the Court of Appeals held that the trial court "erred in applying pro rata allocation of liability instead of an 'all sums' allocation" in its intermediate Order Regarding Allocation but concluded that "this error was rendered moot by the entry of the final judgment." *Id.* According to the court,

> [t]he policies, by their language, are clear—any claims covered by a particular policy must be defended and indemnified by the insurer under that policy. By prorating plaintiff's costs and damages based upon "time on the risk," the trial court reallocated those damages, potentially imposing more costs on one party, and removing them from another, who might be differently obligated. We recognize that these policies represent multiple years of coverage, but judicial expediency is no excuse. We hold that it was indeed error to prorate these costs where the contracts explicitly imposed those obligations otherwise.

*Id.* The court concluded, however, that the trial court's error was corrected by the trial court's final judgment which "assigned costs—both in terms of defense and indemnification—to specific parties based upon their contractual obligations." *Radiator Specialty Co.*, 2020 WL 7039144, at \*5. In the court's view, by entering a

judgment requiring each insurer to "defend and indemnify plaintiff on the . . . claims . . . 'subject to its respective policy limits,' " the trial court "specifie[d] that the allocation is not pro rata, but is instead subject to the contractual limitations established in the policies," which the court interpreted to require all sums allocation. *Id.* Therefore, although the court "recognize[d] the error in the intermediate order," it held that the error "was rendered moot by entry of the final judgment." *Id.*

¶ 16    Third, the Court of Appeals held that the trial court did not err in applying horizontal exhaustion to Landmark's duty to defend. *Id.* According to the court, Landmark's insurance policy "stated that it had the duty to defend suits when (1) the applicable limits of underlying insurance were used up in the payment of judgments or settlements, or (2) no other valid and collectible insurance was available." *Id.* Because the policy specifically used the phrase "other insurance," the court agreed with Landmark that "this language suggests that the policy was only triggered when any other policies held by plaintiff were exhausted." *Id.* Therefore, the court held that "a proper interpretation of the contract reveals that Landmark offered an excess policy, to be available when all other policies were exhausted." *Id.*

¶ 17    Finally, the Court of Appeals dismissed as moot RSC's challenge to the trial court's intermediate order concluding that the defendant-insurers "were not estopped from denying coverage of claims" because the trial court in its final judgment held that the defendant-insurers "owed both a duty to defend *and* a duty to indemnify"

and dismissed one defendant-insurer's challenge to a summary judgment motion addressing cessation of coverage under its own policy. *Radiator Specialty Co.*, 2020 WL 7039144, at \*5–6.[1]

On 10 August 2021, this Court allowed RSC's petition for discretionary review, Fireman's Fund's cross-petition for discretionary review, and Landmark and National Union's conditional petition for discretionary review.

**C. Policies in Dispute**

National Union issued six annual policies to RSC that were effective from 27 November 1987 through 1 May 1992. Five of the policies provide primary liability coverage, and the sixth policy provides excess coverage over the primary policy in effect from 1 May 1991 through 1 May 1992. The primary policies in effect from 27 November 1987 to 1 May 1990 state the following:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" . . . included within the "products-completed operations hazard" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS. This insurance applies only to bodily injury . . . which occurs during the policy period. The "bodily injury" must be caused by an "occurrence." The "occurrence" must take place in the "coverage territory". We will have the right and duty to

---

[1] After the Court of Appeals issued its decision, RSC moved for rehearing on the determination that the allocation issue had been rendered moot by the trial court's final judgment. The Court of Appeals denied the motion.

defend any "suit" seeking those damages . . . .

¶ 20   The primary policies in effect from 1 May 1990 to 1 May 1992 state the following:

> a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" . . . to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages . . . .
>
> \*      \*      \*
>
> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS.
>
> b.      This insurance applies to "bodily injury" . . . only if:
>
> > (1) The "bodily injury" is caused by an "occurrence" that takes place in the "coverage territory," and
> >
> > (2) The "bodily injury" . . . occurs during the policy period.

The sixth policy provides excess coverage and incorporates and adopts the terms of the primary policy from the period of 1 May 1991 to 1 May 1992. All six policies define "bodily injury" as "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time." The policies define the term "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

¶ 21   Fireman's Fund issued three excess liability insurance policies to RSC that were effective during three periods of time: from 10 December 1976 to 17 October

1977; from 17 October 1977 to 17 October 1978; and from 1 May 1979 to 1 May 1980.

Each excess policy incorporated language from certain underlying policies providing

primary liability insurance.

> Agreement #1:
>
> I. COVERAGE —
>
> > Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of liability:
>
> (a) Imposed upon the Assured by law, or
>
> (b) assumed under contract or agreement by the Named Assured and/or any officer, director, stockholder, partner or employee of the Named Assured, while acting in his capacity as such,
>
> for damages on account of —
>
> > (i) Personal Injuries
> >
> > (ii) Property Damage
> >
> > . . . .
>
> caused by or arising out of each occurrence happening anywhere in the world,
>
> . . . .
>
> THIS POLICY IS SUBJECT TO THE FOLLOWING DEFINITIONS:
>
> . . . .
>
> 2. PERSONAL INJURIES —

The term "Personal Injuries" wherever used herein means bodily injury (including death at any time resulting therefrom), . . . sickness, disease, disability, . . . .

. . . .

5. OCCURRENCE —

The term "Occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, [or] property damage . . . during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

Agreement #2:

INSURING AGREEMENTS:

I. Coverage. To pay on behalf of the insured the ultimate net loss in excess of the applicable underlying (or retained) limit hereinafter stated, which the insured shall become obligated to pay by reason of the liability imposed upon the insured by law or assumed by the insured under contract:

(a) PERSONAL INJURY LIABILITY. For damages, including damages for care and loss of services, because of personal injury, including death at any time resulting therefrom, sustained by any person or persons,

(b) PROPERTY DAMAGE LIABILITY. For damages because of injury to or destruction of tangible property including consequential loss resulting therefrom[.]

. . . caused by an occurrence.

. . . .

IV. Other Definitions. When used in this policy . . . .

(a) "Personal Injury" means (1) bodily injury, sickness, disease, disability . . . .

(e) "Occurrence." With respect to Coverage 1(a) and 1(b) occurrence shall mean an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage neither expected nor intended from the standpoint of the insured. . . .

V. Policy Period, Territory. This policy applies only to personal injury, [or] property damage . . . occurrences which happen anywhere during the policy period.


Agreement #3:

I. COVERAGE

 To indemnify the INSURED for ULTIMATE NET LOSS, as defined hereinafter, in excess of RETAINED LIMIT, as herein stated, all sums which the INSURED shall be obligated to pay by reason of liability imposed upon the INSURED by law or liability assumed by the INSURED under contract or agreement for damages and expenses, because of:

 A. PERSONAL INJURY, as hereinafter defined;

 B. PROPERTY DAMAGE, as hereinafter defined;

 . . . .

to which this policy applies, caused by an OCCURRENCE, as hereinafter defined, happening anywhere in the world.

. . . .

## DEFINITIONS

. . . .

H. OCCURRENCE:

With respect to Coverage 1(A) and 1(B) "OCCURRENCE" shall mean an accident or event including continuous repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY or PROPERTY DAMAGE neither expected nor intended from the standpoint of the INSURED. For the purpose of determining the limit of the Company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one OCCURRENCE.

. . . .

I. PERSONAL INJURY:

The term PERSONAL INJURY wherever used herein means:

(1) bodily injury, sickness, disease, disability or shock, including death at any time resulting therefrom . . . .

which occurs during the policy period.

Finally, Landmark issued umbrella/excess liability policies to RSC, which were effective from 8 October 2003 to 1 May 2014. Each policy contains the same provisions, including:

A. Coverage For "Bodily Injury" Liability

The policies afford coverage for "bodily injury" liability:

I.    INSURING AGREEMENT

> 1. We will pay on behalf of the insured those sums in excess of the "retained limit" which the insured becomes legally obligated to pay as damages to which this insurance applies because of "bodily

injury" . . . .

    3.  This insurance applies to "bodily injury" [ ] only if:

        a. The "bodily injury" [ ] is caused by an occurrence;

        b. The "bodily injury" [ ] occurs during the policy period . . . .

## II.    Standard of Review

Summary judgment is reviewed de novo. *In re Will of Jones*, 362 N.C. 569, 573 (2008). Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. N.C.G.S. § 1A-1, Rule 56(c) (2021); *Meadows v. Cigar Supply Co.*, 91 N.C. App. 404, 406 (1988). Insurance contract interpretation is a question of law. *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354 (1970).

## III.    Analysis

### A. Trigger of Coverage – Exposure vs. Injury-in-Fact

The parties dispute at what point each insurer's coverage was triggered. All of the relevant policies provide coverage for "bodily injur[ies]" caused by an "occurrence." The policies tend to define "bodily injury" or "personal injury" as injury, sickness, or disease sustained by a person, and "occurrence" as an accident including exposure. The issue this Court must decide, then, is the point at which the various benzene claimants experienced bodily injury such that RSC's coverage under the

policies was activated. Put differently, we must decide which policies apply to which claims by determining the relevant event that activates an insurer's coverage.

¶ 25    Landmark and National Union argue that this activating or triggering event is a claimant's actual exposure to benzene. Fireman's Fund and RSC contend that the policies do not provide coverage until there is a cognizable injury. As discussed below, we agree with the trial court and the Court of Appeals that a claimant's period of exposure to benzene is the appropriate reference point in determining which policies provide coverage for a given benzene-related injury.

### 1. *Injury-in-fact Trigger Theory*

¶ 26    Fireman's Fund's primary argument in support of an injury-in-fact trigger is that the terms of the policies it offered RSC "provide coverage for 'Personal Injuries' . . . which they define as 'bodily injury,' 'sickness' and 'disease,' which results 'during the policy period.' " According to Fireman's Fund, these terms require an injury-in-fact trigger because the policies only "afford[ ] coverage for *actual injury* which occurs *during the policy period*." Fireman's Fund claims that the policies it offered RSC cannot be triggered by benzene exposure alone because benzene exposure is not itself an injury-causing occurrence.[2]

¶ 27    Next, Fireman's Fund argues that case law supports an injury-in-fact trigger.

---

[2] Medical and scientific evidence presented at the trial was filed under seal. This opinion therefore discusses sealed information only in general terms.

Fireman's Fund points to this Court's decision in *Gaston County Dyeing Machine Co. v. Northfield Insurance Co.*, which held that coverage for property damage was triggered by an "injury-in-fact." 351 N.C. 293, 302–03 (2000). *Gaston* concerned the point at which insurance coverage for property damage caused by a ruptured pressure vessel was triggered. *Id.* at 295. We explained that when "the accident that causes an injury-in-fact occurs on a date certain and all subsequent damages flow from the single event, there is but a single occurrence; and only the policies on the risk on the date of the injury-causing event are triggered." *Id.* at 304.

According to Fireman's Fund, the same logic applies here. Fireman's Fund argues that, even though benzene exposure is the cause of the claimants' injuries, it is the actual injury—the resulting cancers or other physical ailments—that allows claimants to "present claims and file suits against [RSC] in the underlying benzene actions . . . Stated differently, the benzene claimants each allege that [RSC] is liable to them for their cancers—not for the exposure itself." Although Fireman's Fund acknowledges that "unlike the property damage in *Gaston*, the 'bodily injury' here is not a single state confined to a narrow period of time," Fireman's Fund contends that "the key question is the same. Whatever acts prompted the accident in *Gaston*, it was not until the pressure vessel ruptured that damage occurred. If it hadn't ruptured, there would not have been any property damage." Likewise, with respect to benzene exposure, Fireman's Fund argues that "[w]hatever exposures prompted the various

mutations, it was not until a malignancy developed that injury occurred."

¶ 29 Fireman's Fund further argues that the injury-in-fact approach is "widely accepted" and recognizes that "multiple policy periods can be triggered in connection with progressive disease claims." In support of this assertion, Fireman's Fund cites numerous cases applying an injury-in-fact trigger of coverage while still allowing for the "application of a multiple trigger[3] in the context of bodily injury coverage for the progressive disease claims at issue." *See, e.g.*, *Dow Chem. Co. v. Associated Indem. Corp.*, 724 F. Supp. 474, *as supplemented*, 727 F. Supp. 1524 (E.D. Mich. 1989); *Am. Home Prods. Corp. v. Lib. Mut. Ins. Co.*, 565 F. Supp. 1485 (S.D.N.Y. 1983), *as modified*, 748 F.2d 760 (2d Cir. 1984); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178 (2d Cir. 1995). Relying on these cases, Fireman's Fund argues that the appropriate question in applying the injury-in-fact framework is "at which points in time are there identifiable or actual 'personal injuries' . . . proven to have occurred to a reasonable degree of medical certainty?"

¶ 30 Finally, Fireman's Fund argues that benzene exposure causes identifiable injuries-in-fact at various points in time from malignancy until diagnosis or death.

---

[3] The multiple trigger approach recognizes that multiple events may trigger an insurer's coverage such that an insurer may be held liable from the date of the injury-causing occurrence until manifestation of the injury. *See J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29 (1993). Courts that have adopted this approach in the asbestos context, for example, have recognized that "exposure to asbestos or silica, progression of the pathology, or manifestation of the disease" may all trigger an insurer's liability if the insurer was on the risk at the time of any one of these relevant events. *Id.* at 37.

Quoting *Wilder v. Amatex Corp.*, 314 N.C. 550, 560 (1985), Fireman's Fund argues that this Court has already established that "[e]xposure to disease-causing agents is not itself an injury" and that "in the context of disease claims," the point in time when "the immune system fails and disease occurs . . . constitutes the first injury." Though recognizing that benzene is a cancer-causing agent, Fireman's Fund argues that exposure does not *necessarily* have such consequences, and "[t]hus, to describe a mutation or series of mutations that has not developed into a malignancy as 'bodily injury' is not reasonable." In Fireman's Fund's view, a cognizable injury only arises when a malignancy develops into "an 'evolving cancer,' and actual impairment, injuries, sickness, and disease" result, thereby triggering coverage.

¶ 31        RSC similarly argues that a policy's coverage is triggered if and when a claimant suffers bodily injury, sickness, disease, or death during the policy period. According to RSC, both the trial court and the Court of Appeals "erred in holding that coverage is triggered *only* if a claimant experienced *exposure* to benzene during the policy period." Rather, RSC argues that both *Gaston* and the plain language of the policies at issue compel application of the injury-in-fact approach. However, RSC contends that "there is a factual dispute among the parties about how an injury-in-fact trigger applies to the facts of this case." Specifically, because an injury-in-fact trigger has not yet been applied in this litigation, RSC urges that this Court should not be the first to determine "during which policy periods . . . each benzene claimant's

alleged injuries in fact occur[ed]." RSC contends that there is "[c]onflicting medical expert testimony" creating factual and evidentiary disputes that the trial court did not resolve, and which this Court cannot resolve. Accordingly, RSC asks this Court to remand the case to the trial court to allow it "to apply an injury-in-fact trigger of coverage in the first instance."

### 2. *The Exposure Trigger*

¶ 32        By contrast, Landmark and National Union ask this Court to hold that the policies providing coverage for benzene exposure were triggered during the exposure period. As National Union puts it, the lower courts "correctly held that coverage is triggered under those policies in effect during a given claimant's exposure to Benzene." This means that "coverage is triggered if, and only if, the underlying claimant was exposed to benzene during that policy's effective dates because a claimant only experiences 'bodily injury' during exposure to benzene." Landmark and National Union agree that both North Carolina law and medical evidence require this conclusion.

¶ 33        Central to their position is the argument that "a claimant only experiences 'bodily injury' during exposure to benzene." According to National Union, Fireman's Fund's argument "requiring malignancy and/or diagnosable illness" as opposed to DNA damage "functionally reads the term 'bodily injury' out of the definition of 'bodily injury' by equating it with 'sickness' or 'disease.' " In addition to medical evidence

presented at trial, both Landmark and National Union rely on the United States District Court for the Eastern District of North Carolina's decision in *Imperial Cas. & Indem. Co. v. Radiator Specialty Co.*, 862 F. Supp. 1437 (E.D.N.C. 1994), in support of their position.

In that case, the court expressly rejected the manifestation trigger theory for progressive bodily injury and applied the exposure trigger theory based on the "view that exposure to the dangerous substance at issue during the policy period caused immediate, albeit undetectable, physical harm which ultimately led to disease or physical impairment after the expiration of the policy period."[4] *Id.* at 1442. (quoting *Cont'l Ins. Cos. v. Ne. Pharm. & Chem. Co.*, 811 F.2d 1180, 1190 (8th Cir. 1987)). Both National Union and Landmark argue that this holding is consistent with evidence that the actual bodily injuries caused by benzene exposure happen in the days following exposure, whereas the consequences of the injury may take much longer to become detectable.

Despite its relevance, Fireman's Fund contends that *Gaston*'s adoption of an injury-in-fact trigger renders *Imperial Casualty* irrelevant because, although the federal court in that case predicted that this Court would adopt an exposure theory,

---

[4] Citing *Imperial Casualty*, National Union points out that "the majority of federal cases on this issue [progressive diseases] have found coverage by adopting the 'exposure' or the 'continuous exposure,' theory of when injury occurs." 862 F. Supp. at 1442 (citing *Cont'l Ins. Companies v. Ne. Pharm. And Chem. Co.*, 811 F.2d 1180, 1190 (8th Cir. 1987).

this Court opted for the injury-in-fact approach in *Gaston*. Landmark and National Union reject this assertion. For example, National Union responds that *Gaston* "differs from [*Imperial Casualty* and] this case because it assessed trigger of coverage for property damage occurring on a date certain, not claims for bodily injury caused by long-term benzene exposure." According to National Union, *Gaston* actually confirms that courts must "look[ ] to the evidence to determine when the damage took place and not when the consequences of the damage became evident." Likewise, Landmark takes the position that *Gaston* did not adopt an injury-in-fact trigger in the bodily-injury context, noting that *Gaston* considered property damage occurring on a date certain, rather than progressive bodily injury resulting from exposure to a harmful substance.

¶ 36        Finally, National Union argues that this Court should not adopt Fireman's Fund's "continuous trigger" theory that would allow coverage from "all policies in effect from the time a claimant is exposed to benzene until diagnosis or death." Though National Union acknowledges that other courts have applied a continuous trigger theory in the context of asbestos claims, National Union argues that "benzene is different than asbestos" because "[u]nlike benzene, asbestos stays in the body permanently and may continue to cause *new* injuries after exposure." By contrast, benzene "causes injury only during the time periods in which a claimant is exposed to it and then is flushed from the body within hours or days." National Union notes

that other jurisdictions have rejected the continuous trigger theory in cases involving exposure to "substances that cease causing injury once exposure stops" and cause illnesses that do not manifest until years later. *See, e.g.*, *In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405 (Minn. 2003); *Hancock Lab'ys, Inc. v. Admiral Ins. Co.*, 777 F.2d 520 (9th Cir. 1985).

### 3.  *Analysis*

¶ 37    The unambiguous language of each of the relevant policies requires the insurers to indemnify RSC for claims raised by claimants who suffered some form of personal or bodily injury caused by an occurrence and specifies that either the occurrence or the resulting injury must take place during the effective period of the insurer's policy. But, as Landmark and National Union argue, the policies do not define personal or bodily injury to require some diagnosable sickness or disease for coverage to be triggered. For example, the term "personal injury" as used in Fireman's Fund's policies includes a "bodily injury," such as that caused by "exposure."

¶ 38    As Landmark and National Union argue, benzene causes bodily injury upon exposure. Fireman's Fund's and RSC's attempt to redefine "injury-in-fact" as death, disease, or some other physical manifestation of the harm confuses the injury with its consequences. Assuming there is no intervening cause, cancer is a manifestation of the injury that occurs upon benzene exposure that creates a compensable claim. It is not the injury itself. Even though we hold that exposure to benzene is synonymous

with the coverage-triggering injury, that injury is only compensable if it results in damages. In other words, if a person is exposed to benzene but suffers no consequences as a result, the individual has sustained no *compensable* harm.

¶ 39        We are persuaded by the reasoning of *Imperial Casualty*. Quoting the Sixth Circuit's decision in a similar asbestos exposure case, the United States District Court for the Eastern District of North Carolina noted that "[c]umulative disease cases *are* different from the ordinary accident or disease situation" in part because, if the injury-in-fact theory were adopted, "the manufacturer's coverage becomes illusory since the manufacturer will likely be unable to secure any insurance coverage in later years when the disease manifests itself." *Imperial Casualty*, 862 F. Supp. at 1443 (quoting *Ins. Co. of North Am. v. Forty-Eight Insulations*, 633 F.2d 1212, 1219 (6th Cir. 1980)). This makes good sense: If coverage is triggered only upon disease manifestation, then a company that obtained coverage during a period that it manufactured products with benzene could not invoke its coverage if the individuals who were exposed to benzene during the coverage period did not develop a disease or die until after the policy expired. That would make the availability of coverage to RSC predicated on its maintenance of coverage in perpetuity, even if RSC had stopped manufacturing benzene-containing products.

¶ 40        *Gaston* does not overrule or otherwise displace *Imperial Casualty*. In *Gaston*, this Court was selecting between "an 'injury-in-fact' or a 'date-of-discovery' trigger of

coverage . . . where the date of property damage [was] known and undisputed." *Gaston*, 351 N.C. at 299. The Court of Appeals is correct that, in dealing with coverage for property damage, *Gaston* involved distinct factual circumstances. But at their core, the factual distinctions between this case and *Gaston* relate to how to properly define the injury, which in turn controls when coverage is triggered under the relevant policies.

¶ 41    *Gaston* explicitly rejected the notion that coverage-triggering damage "occurs 'for insurance purposes' at the time of manifestation or on the date of discovery." *Id.* at 303 (overruling *W. Am. Ins. Co. v. Tufco Flooring E.*, 104 N.C. App. 312 (1991)). Instead, "the accident that causes an injury-in-fact occurs on a date certain and all subsequent damages flow from the single event, there is but a single occurrence; and only policies on the risk on the date of the injury-causing event are triggered." *Id.* at 304. Nothing in *Gaston* suggests either that exposure to a substance causing alterations to a person's DNA is not an "injury-in-fact" or that an insurer offering coverage when a claimant is exposed to benzene is not liable for all the damages arising from that injury.

¶ 42    Finally, Fireman's Fund argues that, if we apply the exposure theory to this case, we "should also hold that . . . policies in place throughout the development of a claimant's malignancy and the 'evolving cancer,' and the resulting bodily injury, sickness, and disease should be triggered too." According to Fireman's Fund, "it would

be anomalous to hold that coverage is triggered by exposure alone, when the claimant

is healthy, but that there is no coverage triggered during the times when a claimant"

is ill. This application of a continuous trigger would be at odds with our holding that,

in benzene cases, the injury that triggers coverage occurs at the time of exposure.

¶ 43        Consistent with other courts that have decided the issue, National Union and

Landmark have established that an injury occurs at the time of benzene exposure. To

apply a continuous trigger approach in this context would be to adopt Fireman's

Fund's and RSC's mischaracterization of the relevant injury: In order for the policies

to provide coverage, we would be required to label the injury's consequences (*e.g.*,

cancer) as the bodily injury itself. Thus, under these circumstances, a continuous

trigger is necessarily inconsistent with an exposure trigger.[5]

## B. Allocation

¶ 44        Next, the parties ask this Court to determine how to properly allocate RSC's

benzene liabilities among the providers. As discussed, while some injuries occur at a

definite time and place, other injuries, such as those resulting from benzene exposure,

are not so definite and could have resulted from any one exposure over a period of

---

[5] Whether the multiple-trigger theory should apply in a given case requires a fact-intensive analysis regarding the nature of the injury in question. In the context of benzene exposure where DNA mutations occur upon exposure, benzene is expelled from the body within a matter of days, and the injury ceases shortly after exposure ceases, the cancer that may later result is not itself a new injury that would trigger additional policies. But where the injury-inducing condition persists over time, such as in the context of asbestos exposure or environmental contamination, or later results in new, distinct injuries, the multiple-trigger theory may be appropriate.

years. In these circumstances, the injury may implicate numerous insurance policies provided by different insurers over the course of the period during which the damage *could* have occurred. In such cases, it is necessary to determine how to apportion costs arising during the various policy years to the appropriate insurers.

¶ 45 The period during which a particular policy's coverage is triggered is referred to as "time on the risk." Under a pro rata, or time-on-the-risk, allocation approach, "each triggered policy bears a share of the total damages proportionate to the number of years it was on the risk, relative to the total number of years of triggered coverage." Thomas M. Jones & Jon D. Hurwitz, *An Introduction to Insurance Allocation Issues in Multiple-Trigger Cases*, 10 Vill. Envtl. L.J. 25, 42 (1999). As Fireman's Fund explains, "costs are allocated among the policies according to their respective time on the risk." By contrast, all sums, or joint and several, liability "allows recovery in *full* under any triggered policy of the policyholders' choosing and leaves the selected insurer to pursue cross-claims against other carriers whose policies were also available." *Id.* at 37. This means that "any policy on the risk for any portion of the period in which the insured sustained property damage or bodily injury is jointly and severally obligated to respond in full, up to its policy limits, for the loss." *Id.* at 37–38.

¶ 46 All three insurers argue that pro rata allocation is appropriate based on the terms of their policies, whereas RSC advocates for adopting an all sums approach.

The trial court applied the pro rata method, but the Court of Appeals held that all sums allocation was warranted.

### 1. Mootness

¶ 47    Although the Court of Appeals held that the trial court erroneously applied pro rata allocation in its intermediate order, it further held that this error was rendered moot because the trial court entered a final judgment "specif[ing] that the allocation is not pro rata, but is instead subject to the contractual limitations established in the policies," which the Court of Appeals interpreted to require all sums allocation. *Radiator Specialty Co.*, 2020 WL 7039144, at *5.

¶ 48    RSC contends that the Court of Appeals reached the correct ultimate substantive conclusion—that the standard-form policy language compels an all sums rather than pro rata allocation of costs—but "muddled its correct legal ruling by mistakenly failing to apply it to the trial court's Final Judgment."

¶ 49    RSC argues that the trial court's final judgment incorporated the intermediate Order Regarding Allocation, which interpreted the disputed policy language to compel pro rata allocation. When the trial court's final judgment ordered the insurers to defend and indemnify RSC "subject to their respective policy limits," it meant "subject to their respective policy limits" *as interpreted by the trial court* (*e.g.*, subject to their respective policy limits under a pro rata allocation method). RSC asks this Court to correct the Court of Appeals' error and ensure that it is paid in accordance

with the all sums allocation method the Court of Appeals held to be required by the insurance policies.

¶ 50     The insurers do not appear to contest RSC's assertion that the Court of Appeals erred in holding that the trial court's final judgment order rendered its intermediate order moot. Instead, they ask that "[i]f this Court reverses the Court of Appeals' mootness determination, it should also reverse the Court of Appeals' unsupported endorsement of all-sums allocation because all-sums allocation is incompatible with the terms of the National Union policies, inequitable, and bad public policy."

¶ 51     Though RSC is correct that the Court of Appeals misconstrued the trial court's final judgment as calling for all sums allocation, our resolution of the substantive question—that pro rata allocation is appropriate—overrules the Court of Appeals' suggestion to the contrary. For the sake of clarity, the trial court's final judgment should be read to require costs to be assigned pro rata.

### 2. *Pro Rata versus All Sums Allocation*

#### a. *The insurers' pro rata allocation position.*

¶ 52     The insurers' central argument is that the express language of the contracts contemplates pro rata rather than all sums allocation. For example, as National Union explains, its policies with RSC contain one of two substantively identical insuring provisions stating, in effect, that National Union "will pay *those* sums that [RSC] becomes legally obligated to pay as damages because of 'bodily injury' . . . . This

insurance applies only to bodily injury . . . which occurs during the policy period." According to National Union, this "express and plain language require[s] pro-rata allocation, and the Court of Appeals erred in stating otherwise." National Union argues that all sums allocation is only appropriate when an insurance policy specifically contemplates paying "all sums" arising from relevant injuries. "The thinking goes that the promise to pay '*all* sums' renders the insurer responsible for the entirety of the insured's liability, even if only a portion of that liability stems from damage during the policy period." Thus, National Union emphasizes that its policies intentionally use the term "*those* sums" in describing which of RSC's liabilities National Union will become obligated to pay from the policy periods.

¶ 53        In support of this argument, National Union notes that multiple jurisdictions—including jurisdictions that generally apply an all sums allocation approach—have recognized that the phrase "those sums" has a distinct meaning when included in an insurance agreement. *See, e.g.*, *Thomson Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982 (Ind. Ct. App. 2014); *Crossmann Cmtys. Of N.C., Inc. v. Harleysville Mut. Ins. Co.*, 395 S.C. 40 (2011).

¶ 54        Even aside from the "all sums" versus "those sums" distinction, National Union contends that pro rata allocation is appropriate because it "is the only allocation method that gives effect to the National Union Policies' 'during the policy period' language." Relying on many cases that have adopted this interpretation, National

Union argues that this term "unambiguously limits coverage to damages for injuries taking place during the policy's annual term." National Union argues that, "[i]n contrast, the all-sums method ignores the 'during the policy period' language and reads it out of the contract, because it makes an insurer liable for damages attributable to bodily injury happening *outside* the bargained-for policy period." National Union asserts this would "conflict[ ] with fundamental North Carolina law that unambiguous terms in a contract must be enforced as written."

Similarly, Fireman's Fund argues that "[p]ro rata allocation is required by the language of the policies before this Court, which limits coverage for personal injury to those that result 'during the policy period.'" According to Fireman's Fund, pro rata allocation is consistent with the design of " '[o]ccurrence-based' insurance policies . . . [which] provide coverage for a discrete and finite policy period: insurers assume risks only for injuries that occur 'during the policy period.'" By design, occurrence-based provisions "serve[ ] to limit the risks for which insurers accept responsibility."

In effect, the insurers argue that, pursuant to the policies' language, they assumed the risk of certain RSC liabilities "during the policy period." In this way, "the 'policy period' of an insurance policy acts as a substantive limitation on the coverage afforded." In Fireman's Fund's view, pro rata allocation gives effect to these contractual choices because the insurance agreements "afford coverage for personal injury *to which the policies apply*, which is injury that occurs during their respective

policy periods." By contrast, an all sums approach effectively puts one insurer on the hook for injuries occurring in policy periods that its policies do not cover.

¶ 57 According to Fireman's Fund, the modern trend has decisively moved towards pro rata allocation over the all sums approach.[6] In Fireman's Fund's telling, these cases accord with the language of insurance contracts limiting coverage to injuries occurring during the years the coverage is active, giving effect to the bargained-for choices of RSC and the insurers to limit coverage "for all sums attributable to injury occurring during the policy period—not all injury occurring at any time (including injury occurring outside the policy period)."

¶ 58 Fireman's Fund also asserts that "principles of equity and commonsense support pro rata allocation." According to Fireman's Fund, "[i]mposing liability on an all sums basis would create a windfall for policyholders" because "[u]nder an all sums approach, policyholders who bought insurance *for a single year* may obtain exactly the same coverage for loss as those who bought insurance continuously for decades." Fireman's Fund contends that the insured's choices should dictate the level of risk the insured is susceptible to: An insured who chooses to purchase broad coverage from a financially-secure insurer every year over a ten-year period should not be treated

---

[6] *See, e.g.*, *Pa. Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106 (4th Cir. 2012); *Arceneaux v. Amstar Corp.*, 200 So.3d 277 (La. 2016); *S. Silica of La., Inc. v. La. Ins. Guar. Ass'n*, 979 So.2d 460 (La. 2008); *Rossello v. Zurich Am. Ins. Co.*, 468 Md. 92 (2020); *Bos. Gas Co. v. Century Indem. Co.*, 454 Mass. 337 (2009); *Dutton-Lainson Co. v. Cont'l Ins. Co.*, 279 Neb. 365 (2010); *Crossmann Cmtys. of N.C. v. Harleysville Mut. Ins. Co.*, 395 S.C. 40 (2011).

the same as an insured who chooses to purchase narrow coverage for a single year from a risky provider. [7]

¶ 59    Landmark "joins in Fireman's Fund's Appellant Brief concerning the allocation issue" and notes that "the arguments in Fireman's Fund's Appellant Brief concerning why its policy language requires pro-rata allocation instead of all sums allocation apply equally to the Landmark policies." In addition, Landmark notes that its policies "do not contain 'all sums' language," and instead require Landmark only to pay "*those sums* in excess of the 'retained limit' which the insured becomes legally obligated to pay." Thus, Landmark also joins the section of National Union's brief "addressing why 'those sums' policy language further requires pro-rata allocation, instead of all sums allocation, for defense expenses and indemnity sums related to any benzene bodily injury lawsuit that triggers a Landmark policy."

*b.  RSC's all sums allocation position.*

¶ 60    In response, RSC argues that the plain language of the policies "require[s] a triggered Insurer to indemnify RSC for 'all sums' or 'those sums' it becomes legally obligated to pay—not a lesser, prorated sum." According to RSC, cases from other

---

[7] National Union also makes a similar public policy argument as Fireman's Fund, explaining that "[a]n all-sums approach unfairly foists upon insurers the cost for periods in which a policyholder chose not to obtain" adequate insurance. Meanwhile, pro rata allocation "forces companies to internalize part of the costs of long-tail liability and creates incentives for companies to minimize environmental carelessness by not permitting a policyholder who chooses not to be insured . . . to recover as if the policyholder had been fully covered" *EnergyNorth Nat. Gas, Inc. v. Certain Underwriters at Lloyd's*, 156 N.H. 333, 344 (2007)

jurisdictions demonstrate that "the phrase 'all sums' or 'those sums' means . . . a triggered insurer is obligated to pay *all the sums* the insured becomes legally obligated to pay as damages." *See, e.g., Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034 (D.C. Cir. 1981); *J.H. France Refractories Co.*, 534 Pa. 29 (1993); *California v. Cont'l Ins. Co.*, 55 Cal. 4th. 186, *as modified* (Sept. 19, 2012).

¶ 61          RSC contends that language in the relevant policies defining occurrence as "continuous or repeated exposure" and requiring the insurers to pay all " '*damages* because of' bodily injury" indicates that the insurers knew they would be responsible for paying "compensation for ongoing harm suffered *after* the policy period." Similarly, RSC argues that there is language in the policies that is "antithetical to *pro rata* allocation, including continuing coverage, non-cumulation, and prior-insurance provisions," which all presuppose that (1) multiple policies may be called upon to indemnify RSC for a single loss or occurrence, and (2) insurers may be required to indemnify the insured for losses arising outside of the policy period. For example, RSC notes that all three of the insurers' policies "extend coverage beyond the policy period to liability for 'death resulting *at any time* from the bodily injury," provisions which other courts "have found incompatible with *pro rata* allocation." At the same time, RSC emphasizes "the glaring *absence* of any express *pro rata* limitation[,]" an omission that is "particularly notable given that the Insurers have been aware of the hotly contested issue of 'all sums' vs. *pro rata* allocation *for*

*decades."*

RSC contends that the various arguments raised by the insurers in support of pro rata allocation are meritless. First, RSC argues that the phrase " 'during the policy period' . . . does not limit the *extent of coverage*; it merely specifies the *trigger of coverage.*" Second RSC argues that the use of the phrase "those sums" rather than "all sums" does not "clearly and unambiguously require[ ] *pro rata* allocation" because there is "no substantive difference between the promise to pay 'all,' 'those,' or 'the' sums—each phrase promises indemnification for the full amount RSC becomes legally obligated to pay." Third, RSC argues that the insurers have mischaracterized the state of the law on this issue and ignored "older, well-established cases" applying an all sums allocation method, as well as a recent North Carolina trial court decision, *Duke Energy Carolinas, LLC v. AG Insurance SA/NV*, No. 17 CVS 5594, 2020 WL 3042168 (N.C. Super. Ct. June 5, 2020). And fourth, RSC argues that the insurers' appeals to equity are misplaced, both because "[e]quitable considerations cannot trump contractual language" and because regardless, "[e]quity strongly favors RSC." Specifically, RSC emphasizes that under an all sums allocation method, "[n]one of the Insurers are being asked to pay more than its policy limit; no primary insurer is being asked to respond until RSC satisfies the deductible or retention; . . . no excess insurer is being asked to respond until the full amount of the directly underlying policy's limit has been exhausted," and RSC will still be responsible for its decisions

not to obtain adequate insurance for a given year. RSC notes that any insurer who bears the costs based on RSC's selection of a triggered policy may seek contribution from other insurers who were "on the risk" at the time an injury occurred.

### c. Analysis

¶ 63    It is a "well-settled principle that an insurance policy is a contract[,] and its provisions govern the rights and duties of the parties thereto." *Fid. Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380 (1986). "As with all contracts, the object of construing an insurance policy 'is to arrive at the insurance coverage intended by the parties when the policy is issued.'" *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield L.L.C.*, 364 N.C. 1, 9 (2010) (quoting *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354 (1970)). That principle is true here. Key to determining whether all sums allocation is appropriate is whether the policy language provides for such an approach.

¶ 64    Language indicating that an insurer will cover "all sums" must be present in the policy to warrant application of all sums allocation.[8] *See, e.g.*, *Rossello v. Zurich Am. Ins. Co.*, 468 Md. 92, 119 (2020); *Goodyear Tire & Rubber Co. v. Aetna Cas. &*

---

[8] The dissent argues that this statement "erroneously suggests that cases from other jurisdictions . . . require an insurance policy to contain the terminology 'all sums' for an insurer to have complete indemnity obligations." Though the dissent claims this statement is a mischaracterization, in fact, the dispositive language meriting all sums allocation in these cases was the presence of the term 'all sums' (or its equivalent) in the policies. The dissent fails to point to any case in which a court has applied all sums allocation in the absence of "all sums" language or similar terminology.

*Sur. Co.*, 95 Ohio St. 3d 512, 516 (2002); *Keene Corp.*, 667 F.2d at 1047–50; *see also* Thomas M. Jones & Jon D. Hurwitz, *An Introduction to Insurance Allocation Issues in Multiple-Trigger Cases*, 10 Vill. Envtl. L.J. 25, 37 (1999) (explaining that, when implementing the "all sums" approach, courts "usually focus on a policy's 'all sums' language, which commonly states: '[t]he Company will pay on behalf of all the insured all sums which the insured shall become legally obligated to pay' " (alteration in original)).

Though the insurers' policies contain language agreeing to pay "all sums" arising from certain liabilities (or what RSC contends is equivalent language), Fireman's Fund, Landmark, and National Union each point to other language in their policies with RSC that, in their view, expressly limits the policies to bodily injury sustained "during the [respective] policy period[s]." Specifically, Fireman's Fund's agreements generally provide coverage for personal injuries caused by an "occurrence," which is defined as "an accident or a happening or event . . . which unexpectedly and unintentionally *results in personal injury . . . during the policy period*."[9] Landmark's policies provide coverage for "bodily injury" but "only if" the injury "occurs during the policy period." Likewise, National Union's primary policies from 1987 to 1990 "appl[y] only to bodily injury . . . which occurs during the policy

---

[9] Though there are slight variations in language between Fireman's Fund's various policies, all three of the policies state that the occurrences for which coverage is provided are events that happen "during the policy period."

period." Its primary policies from 1990 to 1992 state that it will cover "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury[,]' " but "only if . . . [t]he 'bodily injury' . . . occurs during the policy period."[10]

¶ 66 As the insurers argue, the modern trend is to apply pro rata allocation when limiting language like "during the policy period" exists, even when the policy contains a reference to paying "all sums" arising out of certain liabilities. *See, e.g., Rossello*, 468 Md. at 119 (holding that, where "during the policy period" language was present, "the pro rata approach [was] unmistakably consistent with the language of standard . . . policies"); *Crossmann Cmtys. of N.C.*, 395 S.C. at 62 (applying pro rata allocation where "during the policy period" limiting language was present and explaining that this interpretation "give[s] effect to each part of the insuring agreement (rather than focusing solely on the terms 'all sums' or 'those sums'), [and] . . . is consistent with the objectively reasonable expectations of the contracting parties"). For example, in *Rossello*, an insurance policy stated that the insurer would "pay on behalf of the Insured *all sums* which the Insured shall become legally obligated to pay." 468 Md. at 118. The Court of Appeals of Maryland, the state's highest court, held that even in the face of this provision, pro rata allocation was appropriate. *Id.* at 119. The court explained that reading the policy to require all sums allocation would be "inconsistent

---

[10] National Union's sixth policy providing excess coverage incorporates and adopts the terms of the primary policy from 1991 to 1992 and therefore uses the same language.

with the remainder of the agreement because each policy provides coverage only for 'bodily injury . . . which occurs *during the policy period.*' " *Id.* at 118. The reasoning in *Rossello* similarly applies to the policies at issue here.

¶ 67      This case does involve a slight distinction in that the policy in *Rosello* defined bodily injury as *injuries* that occur during the policy period. Here, Fireman's Fund's policies provide coverage for bodily or personal injuries that result from *occurrences* that happen during the policy period. This distinction is inapposite. As discussed above, exposure to benzene constitutes an "occurrence" that may trigger coverage if the exposure leads to "bodily injury." Because there is very little daylight between exposure and injury in the context of benzene exposure, there is virtually no practical purpose in distinguishing between a clause limiting coverage to injuries that occur during the policy period and those limiting coverage to occurrences during this period. Pursuant to the limiting language of Fireman's Fund's policies then, Fireman's Fund will only indemnify RSC for the costs of such occurrences that take place "during the policy period." *See, e.g.*, *Bos. Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 360, 910 N.E.2d 290, 307–08 (2009). Thus, even if a policy contains language promising to pay for "all sums" that RSC "shall be obligated to pay . . . because of" personal or bodily injury, contractual language that limits this phrase to *either* bodily injuries that occur during the policy period or occurrences that take place during the policy period makes clear that the insurer's obligation is not without limits.

¶ 68 Rather, using Fireman's Fund's policies as an example, the insurer agreed to pay for all of the sums (1) arising from bodily injuries; (2) resulting from occurrences; and (3) that took place during the policy periods. The language "during the policy period" therefore cabins the phrase "all sums" to a finite period of time. It follows that the insurers did not agree to cover all sums arising out of benzene exposure without regard to the policy periods during which incidents of exposure took place.[11] Instead, "[c]onsistent with the policy language limiting coverage to that which occurs 'during the policy period,' the timing of the [occurrence/injury] dictates . . . the portion of damages for which each policy is responsible." *See Rossello*, 468 Md. at 119.[12]

¶ 69 RSC points to a North Carolina Business Court decision that applied all sums allocation based on the appearance of that phrase in an insurance policy. *See Duke Energy Carolinas, LLC v. AG Ins. SA/NV*, No. 17 CVS 5594, 2020 WL 3042168, at *7 (N.C. Super. Ct. June 5, 2020). The business court's application of all sums allocation

---

[11] Because we hold that language limiting the insurers' liability to occurrences that happened "during the policy period," we do not decide whether National Union's and Landmark's use of the term "those sums" in their policies rather than "all sums" provides an additional ground for protection.

[12] To be sure, some courts have applied the all sums approach, even where the limiting language of "during the policy period" appears. *See, e.g., California v. Cont'l Ins.*, 55 Cal. 4th 186, 199–200 (Sept. 19, 2012); *Goodyear Tire & Rubber Co.*, 95 Ohio St. 3d at 515–16; *J.H. France Refractories Co.*, 534 Pa. 29, 41–42 (1993); *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1044–49 (D.C. Cir. 1981). These cases, however, tend to represent an outdated view of the proper interpretation of "pro rata" language. *See Rossello*, 468 Md. at 117. The truncated contractual interpretation they apply fails to full consider the limiting effect of the phrase "during the policy period."

was based on the presence of non-cumulation provisions in the policy at issue, which "recognize[d] that damage may extend beyond the policy period in which the triggering property damage first occurs and reflect the parties' agreement that such damage shall be treated as if all damage occurred in a single premium period, subject to a single policy limit." *Duke Energy*, 2020 WL 3042168, at \*8. Indeed, the business court "conclude[d] that the non-cumulation provisions make plain that the parties' Insuring Agreement in the Policies . . . obligates the insurer to pay all sums which Duke becomes legally obligated to pay because of 'property damage.' " *Id.*

¶ 70          The Business Court's decision in *Duke Energy* is consistent with cases from some jurisdictions that have similarly used the "all sums" approach when non-cumulation or continuing coverage provisions were present in a policy, even when "during the policy period" limiting language was also present. In *In re Viking Pump*, for example, the New York Court of Appeals recently held that "all sums" allocation applied where an insurer's excess policies contained non-cumulation policies with continuing coverage provisions. *In re Viking Pump*, 27 N.Y.3d 244, 264 (2016). There, the court distinguished one of its earlier cases applying pro rata allocation because that case did not consider the effect of non-cumulation provisions on policy language. *Id.* at 259. In short, the court reasoned that, in some contracts, "it would be inconsistent with the language of the non-cumulation clauses to use pro rata allocation" because "[s]uch policy provisions plainly contemplate that multiple

successive insurance policies can indemnify the insured for the same loss or occurrence." *Id.* at 261. It is important to note that both *Duke Energy* and *In re Viking Pump* are distinguishable from this case because, unlike asbestos exposure, for instance, which was at issue in *In re Viking Pump*, we have explained that benzene exposure causes injury at the time of exposure, rather than a continuous injury. *See id.* at 251. Further, its interpretation and application of the non-cumulation provisions do not apply in this case.

National Union's policies do not contain any such provisions, and the reasoning from *In re Viking Pump* and *Duke Energy* is therefore inapplicable.[13] However, RSC characterizes provisions in Fireman's Fund's and Landmark's policies as non-cumulation and continuing coverage provisions. After reviewing the language of these agreements, however, we are not convinced that Fireman's Fund or Landmark contemplated the possibility that they would be liable for "all sums" arising from liabilities that occurred during any policy period.

With respect to Fireman's Fund, RSC argues that Fireman's Fund's umbrella policies "follow form" to the underlying policies, thereby incorporating the underlying

---

[13] RSC argues that all three insurer's policies contain continuing coverage provisions stating that the policies "extend coverage beyond the policy period to liability for 'death resulting *at any time* from the bodily injury.' " In the context of benzene exposure, this provision does not suggest an insurer contemplated all sums allocation. Because the *injury* occurs at the time of exposure whereas the consequences of that injury, such as death, occur long after, it is not just logical, but necessary, that the insurers would remain liable for the injuries' consequences, but not for injuries that occur outside of their respective policy periods.

policies' terms. These underlying policies, in turn, contain non-cumulation provisions. Thus, RSC contends that the non-cumulation provisions are included within the umbrella policies.[14] RSC recognizes that "non-cumulation and prior insurance provisions have a well-recognized purpose: *to limit an insurer's liability* to a single policy limit when an occurrence triggers multiple policies issued by that insurer." But Fireman's Fund's excess policies at issue "expressly *do not* incorporate underlying provisions that relate to the amount and limits of liability" like the non-cumulation provisions. *See, e.g.*, *Deere & Co. v. Allstate Ins. Co.*, 32 Cal. App. 5th 499, 517 (2019), *as modified on denial of reh'g* (Mar. 26, 2019) (recognizing that follow form provisions in excess insurance policies excluded underlying terms related to "the amounts and limits of liability," and holding that the excess policies' follow form clauses incorporated "the scope (*i.e.* products-liability coverage) of the first-layer policies but not the monetary caps on liability"); *Int'l. Paper Co. v. Affiliated FM Ins. Co.*, No. 974

---

[14] RSC points to two non-cumulation provisions that it believes have been incorporated into Fireman's Fund's excess policies:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability . . . shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

> If collectible insurance under any other policy(ies) of the COMPANY is available to the INSURED, covering a loss also covered hereunder . . . the COMPANY'S total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy(ies).

350, 2005 WL 7872235, at \*5-6 (Cal. Super. Mar. 17, 2005) (concluding that umbrella policy followed form to underlying policy, except with respect to non-cumulation provision based on umbrella policy's exception excluding incorporation of underlying policy terms pertaining to "the amount and limits of liability"). Thus, the non-cumulation provisions are not incorporated into the umbrella policies in the first instance.

¶ 73    Further, RSC "misconstrues" Fireman's Fund's non-cumulation provisions. *See Cont'l Cas. Co. v. Hennessy Indus., Inc.*, No. 1-18-0209, 2019 Ill. App. Unpub. LEXIS 218, at \*44 (Ill. Ct. App. Feb. 13, 2019). Importantly, "the language of the clauses provides for their application where more than one policy is required to indemnify for the same loss, *not* where the policy is required to indemnify for a loss that occurred outside its policy period." *Id.* In other words, the policies simply impose coverage limits on the amount RSC may claim if other policies provide coverage for a single injury.

¶ 74    RSC similarly misinterprets the "continuing coverage" provisions it points to in Landmark's policies.[15] The language RSC emphasizes describes Landmark's obligations for a continuous injury. Even assuming the health effects of benzene

---

[15] RSC points to a provision in Landmark's policies which states the following: " 'Bodily injury' . . . which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured . . . includes any continuation, change or resumption of that 'bodily injury' . . . after the end of the policy period."

exposure can be described in this manner, which Landmark disputes, the provision does not suggest that Landmark agrees to assume responsibility for all liabilities from any policy period. This language "simply sets forth the unremarkable proposition . . . [that] the policy in place when the injury occurs will cover all consequential damages, even those taking place after the policy period." *New England Insulation Co. v. Liberty Mut. Ins. Co.*, 83 Mass. App. Ct. 631, 637 (2013). As such, the non-cumulation and continuing coverage provisions that RSC points to do not counsel against pro rata allocation in the context of this case.[16]

## C. Exhaustion

¶ 75        Finally, we must decide whether horizontal or vertical exhaustion applies to Landmark's duty to defend RSC under the umbrella policies Landmark issued. While an insurer's duty to indemnify an insured arises from policy language agreeing to pay "all sums" or "those sums" arising from certain liabilities that the insured becomes legally obligated to pay, some policies also contain the duty to defend lawsuits, claims, proceedings, etc. related to various forms of injury. RSC contends that its policies with both Landmark and National Union contain such a duty. It is Landmark's duty to defend that is at issue in this appeal, as the trial court found, and the Court of Appeals affirmed, that only horizontal exhaustion of all other available policies

---

[16] Because our holding is specific to the nature of benzene-related injury, it does not conflict with the holdings of *Duke Energy* and *In re Viking Pump*.

triggers its duty. *See Radiator Specialty Co.*, 2020 WL 7039144, at \*5.

Vertical exhaustion allows a policyholder to obtain coverage from an excess policy once the primary policies beneath it within the same policy period are exhausted. *See Cmty. Redevelopment Agency v. Aetna Cas. & Sur. Co.*, 50 Cal. App. 4th 329, 339–40 (1996). Horizontal exhaustion, on the other hand, requires a policyholder to exhaust all primary policies from other policy periods in order to access excess coverage. *See Kajima Constr. Serv., Inc. v. St. Paul Fire & Marine Ins. Co.*, 227 Ill.2d 102, 105 (2007). The trial court adopted a mixed approach, applying horizontal exhaustion to Landmark's duty to defend but vertical exhaustion to its duty to indemnify. In other words, with respect to Landmark's duty to defend, the trial court held that the duty only exists when all other policies have been exhausted. The Court of Appeals affirmed, holding that Landmark's duty to defend was triggered by horizontal exhaustion.

### 1. *RSC's and Landmark's Competing Contractual Interpretations*

The provision relevant to this dispute states:

> 2. [Landmark] will have the right and duty to defend any "suit" seeking those [i.e., covered] damages when:
>
> a. The applicable limits of insurance of the "underlying insurance" and other insurance have been used up in the payment of judgments or settlements; or
>
> b. No other valid and collectible insurance is available to the insured for damages covered by this policy.

According to Landmark, Sections 2(a) and 2(b) are properly read in conjunction

to mean that "a duty to defend may arise under a Landmark policy for a given Benzene Action seeking covered damages when all of RSC's . . . primary policies are exhausted, and there is no *other* valid, solvent policy available to cover the Benzene Action." Landmark policies define the phrase "underlying insurance" in the first prong as "the policies [ ] listed in the Schedule of Underlying Insurance." While this term is specifically defined, the term "other insurance" in Section 2(a) is not. Thus, Landmark argues that "other insurance" must be given a separate, ordinary meaning. Because the phrase "underlying insurance" encompasses exactly what it suggests—the underlying, primary policies in a given policy period—Landmark argues that "other insurance" necessarily encompasses "any other policies held by [RSC]" that were unexhausted, including those outside of the policy year. This reading exemplifies horizontal exhaustion. Landmark then reads the second prong as "simply meaning a valid policy issued by a solvent insurer." According to Landmark, absent the second prong, "the existence of an unexhausted primary policy, *which is invalid or issued by an insolvent insurer*, would preclude a duty to defend because of the first prong."

¶ 79        Applying its vertical exhaustion approach, RSC interprets the provision differently and believes that Section 2(b) is properly read in isolation—a reading which would make Landmark's policies "the only available insurance for Benzene Claims *during the Landmark Policy Periods*" and trigger Landmark's duty to defend

under Section 2(b).

Based on this interpretation, RSC argues that the trial court correctly applied vertical exhaustion to the *duty to indemnify* under Landmark's umbrella policies but erred in applying horizontal exhaustion to the *duty to defend* under those same policies. According to RSC, "[n]early all jurisdictions have rejected horizontal exhaustion altogether, and no court has *ever* adopted the trial court's mixed approach of horizontal exhaustion for defense but vertical exhaustion for indemnity."

RSC further argues that horizontal exhaustion is inapplicable "because Landmark is functioning as a *primary* insurer." According to RSC, the "directly underlying primary policies"—*i.e.*, the primary policies issued during the same years Landmark's umbrella policies applied—included "pre-existing damages exclusions" that expressly precluded the primary insurer from paying benzene-related claims. RSC's argument that horizontal exhaustion does not apply is based on the idea that "Landmark's umbrella policies 'drop down' and provide primary (*i.e.*, first-dollar) coverage because there is no benzene coverage 'underlying' Landmark's policies."

RSC also contends that horizontal exhaustion "contradicts North Carolina Law." According to RSC, Landmark's contention that the phrase "any other insurance" appearing in its policies "requires exhausting primary policies in previous and subsequent policy years before any excess policy must respond" is in conflict with North Carolina cases that "consistently interpret 'other insurance' language as

referencing only concurrent coverage available within the same policy period." RSC argues that the cases Landmark relies upon—including *Gaston*—"are inapposite because they involved concurrent policies in effect during the *same* policy year—*i.e.*, vertical exhaustion scenarios." In addition, RSC notes that a leading insurance treatise defines "other insurance" as referring to "only to two or more concurrent policies, which insure the same risk and the same interest, for the benefit of the same person, *during the same period*."

¶ 83        Finally, RSC argues that requiring horizontal exhaustion would (1) "effectively increase the operative attachment point" (*e.g.*, the point at which umbrella coverage becomes available) "for each excess insurance policy many times over," (2) be difficult to apply, and (3) impose a significant burden on insureds to prove eligibility for coverage.

¶ 84        Landmark, on the other hand, argues that the lower courts "correctly ruled that the Landmark policies require 'horizontal exhaustion' before Landmark's duty to defend may arise." As explained previously, Landmark first argues that RSC's position that vertical exhaustion applies ignores and contradicts the language of the relevant policy agreement.

¶ 85        Next, Landmark argues that application of a horizontal exhaustion requirement is consistent with prior cases that "have given effect to umbrella policy provisions requiring exhaustion of unscheduled primary policies." In particular,

Landmark points to *Reliance Insurance. Co. v. Lexington Insurance Co.*, 87 N.C. App. 428 (1987), a case in which Landmark contends the Court of Appeals "did not require the [umbrella insurer] to pay upon exhaustion of the scheduled underlying [primary insurance policy]," but instead required the umbrella insurer to pay only once the "*unscheduled* primary insurance" was also exhausted. Similarly, Landmark points to *Harleysville Mutual Insurance Co. v. Zurich-American Insurance Co.*, 157 N.C. App. 317, *disc. rev. denied*, 357 N.C. 250 (2003), another case where Landmark contends that "[b]ecause there was an unexhausted, unscheduled primary policy, [the] court held [the] umbrella policy did not apply." Although Landmark acknowledges that *Reliance* and *Harleysville* "involved unscheduled primary policies effective *during the same period* as the umbrella/excess policy," Landmark contends that these decisions are "instructive because they required exhaustion of all scheduled *and unscheduled primary policies* before the umbrella/excess policy responded."

¶ 86        Landmark disputes RSC's argument that Landmark's umbrella policy was operating as a primary policy because the underlying policy excluded benzene claims from coverage. According to Landmark, this argument "is not really an argument at all" because it ignores "the policy language to the contrary" contained in the insurance agreement. Landmark contends that the fact that "the scheduled underlying policies may exclude coverage [for benzene claims] does not change [the] result, because both scheduled *and unscheduled* primary policies must be exhausted and unavailable

before Landmark's attachment point is reached."

### 2. Analysis

¶ 87      We agree that the most logical reading of the agreement between Landmark and RSC requires vertical exhaustion. Landmark's interpretation ignores basic terms within the agreement, contrary to its insistence that contractual language be given "its ordinary meaning."

¶ 88      Most fundamentally, Landmark's interpretation fails to acknowledge the agreement's use of the disjunctive "or." "Where a [contract] contains two clauses which prescribe its applicability, and the clauses are connected by a disjunctive (*e.g.* 'or'), the application of the [contract] is not limited to cases falling within both clauses, but will apply to cases falling within either of them." *Davis v. N.C. Granite Corp.*, 259 N.C. 672, 675 (1963) (cleaned up); *see also* 73 Am. Jur. 2d, *Statutes* § 147 (2022) ("In its elementary sense the word 'or' . . . is a disjunctive particle indicating that the various members of the sentence are to be taken separately."). This word, though simple, gives a contractual provision a very different meaning than a contractual provision with otherwise identical language but instead using a conjunctive phrase, as the latter provision requires the connecting sentences to be read in tandem. *See Wells Fargo Ins. Servs. USA v. Link*, 372 N.C. 260, 272–73 (2019). Landmark's reading of Section 2 would have us ignore this basic principle of contractual interpretation.

From Landmark's perspective, its duty to defend RSC does not arise unless (1) all other scheduled and nonscheduled policies have been exhausted; *and* (2) no other valid and collectible policy is available to cover this action. This interpretation disregards that the agreement's use of the term "or" requires us to read these circumstances as alternative options that trigger Landmark's duty to defend. Thus, taking Section 2(b) on its own, Landmark's duty to defend was triggered so long as "[n]o other valid and collectible insurance [was] available to [RSC] for damages covered by th[e] policy." According to RSC, its underlying insurance policies covering the same periods as its Landmark policies do not provide coverage for benzene actions, whereas the Landmark policies do. There was therefore no other "valid and collectible insurance" for damages from the benzene actions other than the Landmark policies themselves.

Moreover, as the New York Court of Appeals recently explained, " 'other insurance' clauses 'apply when two or more policies provide coverage during the *same* period, and they serve to prevent multiple recoveries from such policies.' " *In re Viking Pump*, 27 N.Y.3d at 266 (quoting *Consol. Edison Co. v Allstate Ins. Co.*, 98 N.Y.2d 208, 223 (2002)). Contrary to Landmark's assertion that "other insurance" implicates policies from other periods, "such clauses 'have nothing to do' with 'whether any coverage potentially exist[s] at all among certain high-level policies that were in force during *successive years.*' " *Id.* (alteration in original) (quoting *Consol. Edison*, 98

N.Y.2d at 223). This interpretation of "other insurance" is consistent with decisions from North Carolina's courts. *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.*, 919 F.2d 235, 241 (4th Cir. 1990) (explaining that "other insurance" clauses "apply only when the coverage is concurrent[, and] [w]here . . . the polic[y] periods did not overlap at all, such clauses are not applicable"); *City of Greensboro v. Rsrv. Ins. Co.*, 70 N.C. App. 651, 660 (1984) (explaining that "other insurance" language is implicated only where "policies provide overlapping or concurrent coverage"); *see also Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 315 Wis.2d 556, 580 (2009) ("The accepted meaning of 'other insurance' provisions does not include application to successive insurance policies.").

¶ 91    Because RSC is not "seeking multiple recoveries from different insurers under concurrent policies for the same loss, and the other insurance clause does not apply to successive insurance policies," Section 2(a) does not indicate Landmark intended that its duty to indemnify be subject to horizonal exhaustion. *See In re Viking Pump*, 27 N.Y.3d at 266. We therefore conclude that Landmark's excess policies are triggered when vertical exhaustion has been achieved, such that there is no other "valid and collectible" policy available to cover a benzene action during a concurrent policy period.

## IV.    Conclusion

¶ 92    We affirm in part and reverse in part the Court of Appeals' decision below. We

affirm its holding that the trial court correctly applied an exposure-based approach in determining at what point the insurers' coverage was triggered. However, we reverse its holding that the trial court's final judgment rendered the trial court's decision regarding allocation moot, and we further hold that the trial court properly applied pro rata allocation based on the policies at issue. Finally, we reverse the Court of Appeals' decision to uphold the trial court's finding that horizontal exhaustion applies to Landmark's duty to defend, and we hold that this duty is instead triggered by vertical exhaustion. Accordingly, we remand this case to the trial court to apply vertical exhaustion and to conduct other proceedings consistent with this opinion.

AFFIRMED IN PART AND REVERSED IN PART; REMANDED.

Justice BERGER did not participate in the consideration or decision of this case.

Justice BARRINGER concurring in part and dissenting in part.

¶ 93        While I agree with the majority on several points, the majority neglects to

follow this Court's well-established rules of construction for insurance policies.

> A contract of insurance should be given that
> construction which a reasonable person in the position of
> the insured would have understood it to mean and, if the
> language is reasonably susceptible of different
> constructions, it must be given the construction most
> favorable to the insured. Indeed, we have stated that
> probably the most important general rule guiding the
> courts in the construction of insurance policies is that all
> doubt or uncertainty, as to the meaning of the contract,
> shall be resolved in favor of the insured.

*Register v. White*, 358 N.C. 691, 699–700 (2004) (cleaned up); *see, e.g.*, *Harleysville*

*Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 9–10 (2010); *Grant v.*

*Emmco Ins. Co.,* 295 N.C. 39, 43 (1978). These rules of construction apply to all types

of insurance and to all insureds, whether an individual or an entity.

¶ 94        Nevertheless, the majority reads into the policies limiting language that is not

there. Specifically, none of the policies before us require (a) the occurrence to occur in

the policy period or (b) the damages to occur in the policy period. Rather, the limiting

language of "during the policy period" only modifies the defined term "Bodily injury"

(or "Personal injury"). While it may be tempting for this Court to rule without

analyzing the policy language, shirking our duty for a simple solution should concern

all. Any business or individual who has purchased insurance could be in a similar situation to the plaintiff before us now. Radiator Specialty Company (Radiator) has for almost a decade had to litigate against their insurers to compel them to provide them the coverage they purchased. Therefore, I respectfully concur in part and dissent in part.

## I.    Background and Policies

¶ 95    In the course of its business, Radiator purchased standard-form product liability policies from various insurers, including defendants Fireman's Fund Insurance Company (Fireman), Landmark American Insurance Company (Landmark), and National Union Fire Insurance Company of Pittsburgh, PA (National). In 1994, claimants nationwide began filing lawsuits, alleging that exposure to Radiator's products caused them to develop cancer.

¶ 96    In 2013, Radiator filed this action seeking a declaration of the duties and obligations of the defendant insurers regarding fifty-five policies. Radiator alleged that it had incurred and paid defense and indemnity amounts for products liability claims related to alleged benzene in its products and that the defendant insurers had not indemnified Radiator for defense costs or liabilities for these claims.

¶ 97    In 2015, the parties moved for summary judgment on various issues of insurance contract interpretation, which are addressed herein as pertinent to the appeal before us. In 2018, the case proceeded to a bench trial. The trial court

addressed the following factual question: "For purposes of triggering the duty to indemnify, what is the date the claimant was first exposed and last exposed to any [Radiator] benzene-containing product with respect to each settled Benzene Claim?" The trial court then entered a final judgment. Some of the parties appealed the summary judgment orders.

¶ 98          The policies issued by Landmark to Radiator state:

    **I.   INSURING AGREEMENT**

        **1.**  We will pay on behalf of the insured those sums in excess of the "retained limit" which the insured becomes legally obligated to pay as damages to which this insurance applies because of "bodily injury", "property damage" or "personal and advertising injury".

        . . . .

        **3.**  This insurance applies to "bodily injury" and "property damage" only if:

            **a.**  The "bodily injury" or "property damage" is caused by an occurrence;

            **b.**  The *"bodily injury"* or "property damage" occurs *during the policy period*; . . .

        . . . .

    **V.  DEFINITIONS**

        . . . .

        **3.**  "Bodily injury" means bodily injury, sickness, disease, disability, shock, mental anguish, mental injury and

humiliation of a person, including death resulting from any of these at any time.

. . . .

14. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(Italic emphases added.)

¶ 99        The policies issued by National to Radiator state:

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" included within the "products-completed operations hazard" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS. This insurance applies only to "*bodily injury*" and "property damage" *which occurs during the policy period*. The "bodily injury" and "property damage" must be caused by an "occurrence." The "occurrence" must take place in the "coverage territory". . . .

      . . . .

   b. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

   . . . .

**SECTION V - DEFINITIONS**

. . . .

**2.** "Bodily injury" means bodily injury, sickness or disease
sustained by a person, including death resulting from
any of these at any time.

. . . .

**8.** "Occurrence" means an accident including continuous
or repeated exposure to substantially the same general
harmful conditions.

(Italic emphases added.)

¶ 100    The first policy issued by Fireman follows form[1] to the underlying insurance

with the following policy language:

## INSURING AGREEMENTS

**I.    COVERAGE –**

Underwriters hereby agree, subject to the limitations,
terms and conditions hereinafter mentioned, to indemnify
the Assured for all sums which the Assured shall be
obligated to pay by reason of liability

(a)    Imposed upon the Assured by law,
. . . .

---

[1] Excess policies are often described as either a "stand-alone policy" or a "follow form"
policy. *New Appleman on Insurance Law Library Edition, Essentials of Insurance Law*
§ 1.06[7], at 1-61 (Jeffrey E. Thomas & Francis J. Mootz III eds., 2010). "An 'excess policy'
provides coverage above the underlying limit of primary insurance . . . ." *Id.* An excess policy,
thus, "expands the dollar amount of coverage available to compensate for a loss." *Id.* A stand-
alone policy "relies on its own insuring agreement, conditions, terms, and definitions to
describe the coverage." *Id.* A follow form policy "incorporates by reference the terms,
conditions, exclusions, etc. of the primary policy." *Id.*

for damages on account of: –

(i) Personal Injuries
(ii) Property Damage
(iii) Advertising liability,

caused by or arising out of each occurrence happening anywhere in the world.

. . . .

## THIS POLICY IS SUBJECT TO THE FOLLOWING DEFINITIONS:

. . . .

## 2. PERSONAL INJURIES –

The term "Personal Injuries" wherever used herein means bodily injury (including death at any time resulting therefrom), mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation; also libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any Advertising activities.

. . . .

## 5. OCCURRENCE –

The term "Occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally *results in personal injury*, property damage or advertising liability *during the policy period*. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

**6.** **DAMAGES** –

The term "Damages" includes damages for death and for care and loss of services resulting from personal injury.

(Italic emphases added.)

The second policy issued by Fireman follows form to the underlying insurance with the following policy language:

**INSURING AGREEMENTS**

**I** **Coverage.** To pay on behalf of the insured the ultimate net loss in excess of the applicable underlying (or retained) limit hereinafter stated, which the insured shall become obligated to pay by reason of the liability imposed upon the insured by law or assumed by the insured under contract:
 (a) PERSONAL INJURY LIABILITY. For damages, including damages for care and loss of services, because of personal injury, including death at any time resulting therefrom, sustained by any person or persons,

 . . . .

to which this insurance applies under Coverages I(a) . . . above, caused by an occurrence.

. . . .

**IV** **Other Definitions.** When used in this policy (including endorsements forming a part hereof):
 (a) **"Personal injury"** means (1) bodily injury, sickness, disease, disability, shock, fright, mental anguish

and mental injury; (2) false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution or humiliation; (3) libel, slander, defamation of character or invasion of right of privacy, unless arising out of any advertising activities; and (4) assault and battery not committed by or at the direction of the insured, unless committed for the purpose of preventing or eliminating danger in the operation of aircraft or for the purpose of protecting the property of the insured or the person or property of others;

. . . .

(e) **"Occurrence."** With respect to Coverage I(a) . . . occurrence shall mean an accident, including injurious exposure to conditions, which results, *during the policy period, in personal injury* or property damage neither expected nor intended from the standpoint of the insured. For the purpose of determining the limit of the company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

. . . .

**V    Policy Period, Territory.** This policy applies only to *personal injury*, property damage or advertising occurrences *which happen* anywhere *during the policy period.*

(Italic emphases added.)

¶ 102    The third policy issued by Fireman follows form to the underlying insurance with the following policy language:

**INSURING AGREEMENTS**

## I.    COVERAGE

To indemnify the INSURED for ULTIMATE NET LOSS, as defined hereinafter, in excess of RETAINED LIMIT, as herein stated, all sums which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED by law . . . because of:

A.  PERSONAL INJURY, as hereinafter defined;

. . . .

to which this policy applies, caused by an OCCURRENCE, as hereinafter defined, happening anywhere in the world.

. . . .

## DEFINITIONS

. . . .

**H.  OCCURRENCE:**

With respect to Coverage I(A) and I(B) "OCCURRENCE" shall mean an accident or event including continuous repeated exposure to conditions, which results, *during the policy period, in PERSONAL INJURY* or PROPERTY DAMAGE neither expected nor intended from the standpoint of the INSURED. For the purpose of determining the limit of the Company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one OCCURRENCE.

**I.   PERSONAL INJURY:**

The term PERSONAL INJURY wherever used herein means:

(1)  bodily injury, sickness, disease, disability or shock, including death at any time resulting therefrom, mental anguish and mental injury,

(2)  false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention or malicious prosecution,
(3)  Libel, slander, defamation of character, humiliation or invasion of the rights of privacy, unless arising out of advertising activities,

which occurs *during the policy period*.

(Italic emphases added.)

## II.    Analysis

### A. Trigger for Coverage

¶ 103        As to the first issue, the trigger for coverage, the majority correctly holds that there is no material question of fact that benzene exposure caused "bodily injury" in the form of alterations[2] to DNA at the time of exposure. On the record before this Court, the evidence indisputably supports that a "bodily injury" in fact occurred upon exposure to benzene for the individuals that later developed benzene related diseases and sued Radiator.

¶ 104        However, the term "Bodily injury" (or "Personal injury" as used in Fireman's policies) is defined to include not only "bodily injury" but also "sickness or disease sustained by a person, including death resulting from any of these at any time." Hence, in accordance with the policy language, a "Bodily injury" (or "Personal injury") will also occur upon a person sustaining sickness or disease from an occurrence.

---

[2] Experts also used the terminology of DNA damage and mutation.

¶ 105   Here, that occurrence is benzene exposure. While a few of the policies do contain other limiting language, such as "all personal injury . . . arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence," which could prevent the stacking of policy limits for continuous and repeated exposures, there is no language in any policy before this Court limiting or precluding the triggering of the policy upon sickness or disease because a bodily injury previously occurred. Thus, Radiator could establish that multiple policies are triggered for the same occurrence, here, exposure to benzene. *See Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1195 (2d Cir. 1995) ("[T]here can be triggering at more than one point in time when a claimant asserts injury-in-fact due to . . . cancer."), *opinion modified on denial of reh'g*, 85 F.3d 49 (2d Cir. 1996). Even if the policy language was ambiguous, "[t]his Court resolves any ambiguity in the words of an insurance policy against the insurance company." *Harleysville*, 364 N.C. at 9.

¶ 106   In contrast, the majority, without analyzing the policies or citations, merely concludes that an "application of a continuous trigger would be at odds with our holding that, in benzene cases, *the* injury that triggers coverage occurs at the time of exposure." (Emphasis added.) However, we should not and cannot ignore the policy language in this case. The policy language dictates the triggers for indemnity as bodily injury during the policy period, with bodily injury meaning bodily injury,

sickness, or disease (among other things in some policies) without additional limiting language. Thus, the policy language clearly contemplates and provides for the possibility of multiple triggers.

¶ 107     Further, this Court is reviewing a summary judgment order. This Court reviews a summary judgment order de novo to assess the policy language and the evidence to determine if there is a genuine issue as to any material fact and whether any party is entitled to judgment as a matter of law. *See* N.C.G.S. § 1A-1, Rule 56(c) (2021); *N.C. Farm Bureau Mut. Ins. Co., Inc. v. Martin*, 376 N.C. 280, 285–86 (2020). In this case, there is no material question of fact that a bodily injury in fact occurs upon exposure to benzene. However, in future cases, the policy language and expert testimony may vary.

## B. Indemnity Obligation

¶ 108     As to the second issue concerning the insurers' indemnity obligation, the majority inverts the rules of construction for insurance policies by creating a rebuttable presumption in favor of an insur*er*. The majority also erroneously suggests that cases from other jurisdictions *require* an insurance policy to contain the terminology "all sums" for an insurer to have complete indemnity obligations.

¶ 109     To the contrary, the cases cited by the majority that apply all sums allocation recognize the absence of language limiting the insurer's liability once triggered. *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1048 (D.C. Cir. 1981) ("Once triggered,

each policy covers [the insured]'s liability. There is *nothing* in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period."); *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur.* Co., 95 Ohio St. 3d 512, 2002-Ohio-2842, 769 N.E.2d 835, at ¶ 9 ("There is no language in the triggered policies that would serve to reduce an insurer's liability if an injury occurs only in part during a given policy period. The policies covered [the insured] for 'all sums' incurred as damages for an injury to property occurring during the policy period. The plain language of this provision is inclusive of all damages resulting from a qualifying occurrence. Therefore, we find that the 'all sums' allocation approach is the correct method to apply here."). Other courts have also stated, "The majority of courts have held that without a *pro rata* clause in the policies, the insurance companies cannot limit their obligations to a *pro rata* share or portion of [the insured]'s liabilities." *Monsanto Co. v. C.E. Heath Comp. & Liab. Ins. Co.*, 652 A.2d 30, 35 (Del. 1994).

¶ 110    But regardless, this Court's binding precedent directs us to the policy language and requires us to consider what the reasonable insured would understand the policy to mean. *See Register*, 358 N.C. at 699–700. Moreover,

> [i]n the construction of contracts, even more than in the construction of statutes, words which are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage, rather than a

restrictive meaning which they may have acquired in legal
usage.

*Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 266 N.C. 430, 438 (1966).

¶ 111          As reflected in previous quotes of the policy language, each policy essentially

states:

> We will pay on behalf of the insured those sums in excess
> of the "retained limit" which the insured becomes legally
> obligated to pay as damages to which this insurance
> applies because of "bodily injury", "property damage" or
> "personal and advertising injury"

¶ 112          Stripped down to the relevant portion, it says: We will pay those sums which

the insured becomes legally obligated to pay as damages to which this insurance

applies. In other words, if Radiator becomes legally obligated to pay damages for an

occurrence to which a policy issued by Landmark applies, Landmark will pay those

sums. Those sums are the damages Radiator becomes legally obligated to pay as

damages for an occurrence resulting in bodily injury *during the policy period*.

¶ 113          As correctly recognized by the Court of Appeals, nothing in the policy language

drafted by the insurers (Landmark, National, or Fireman) modifies the insurer's

indemnity obligation to be proportional to their policies' "time on the risk" when

damages arise from multiple occurrences and multiple bodily injuries, thus triggering

multiple policies. *Radiator Specialty Co. v. Arrowood Indem. Co.*, No. COA19-507,

2020 WL 7039144, at *4 (N.C. Ct. App. Dec. 1, 2020) (Bryant, J. with Chief Judge

McGee concurring and Judge Berger concurring in result only); *see generally Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 2009 WI 13, ¶ 55, 315 Wis. 2d 556, 759 N.W.2d 613 ("[The insurer's] policy contains no language that limits its obligation to a pro rata share."); *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1058 (Ind. 2001) ("[T]here is no language in the coverage grant, including the definitions of 'property damage,' 'personal injury,' or 'occurrence,' that limits [the insurer's] responsibility to indemnification for liability derived solely for that portion of damages taking place within the policy period.").

> [T]he very essence of pro rata allocation is that the insurance policy language limits indemnification to losses and occurrences during the policy period—meaning that no two insurance policies, unless containing overlapping or concurrent policy periods, would indemnify the same loss or occurrence. Pro rata allocation is a legal fiction designed to treat continuous and indivisible injuries as distinct in each policy period as a result of the "during the policy period" limitation, despite the fact that the injuries may not actually be capable of being confined to specific time periods.

*In re Viking Pump, Inc.*, 52 N.E.3d 1144, 1153–54 (N.Y. 2016), *opinion after certified question answered,* 148 A.3d 633 (Del. 2016).

¶ 114   In these policies, the language "during the policy period," as previously discussed only modifies the defined term "bodily injury." In other words, indemnification *is not limited* to damages during the policy period or occurrences during the policy period. Thus, "[t]he average person purchasing insurance would

construe the policy language to provide indemnity for an injury once the policy was triggered." *Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co.*, 951 P.2d 250, 256 (Wash. 1998). "[B]odily injury during the policy period is what triggers the policy; the definition of 'bodily injury' is not a limitation of liability clause." *Plastics Eng'g*, ¶ 57. There is no exclusion of damages occurring outside the policy period. *See generally Mazza v. Med. Mut. Ins. Co. of N.C.*, 311 N.C. 621, 630 (1984) ("We place great emphasis on the fact that there is no specific exclusion in the insurance contract for punitive damages. If the insurance carrier to this insurance contract intended to eliminate coverage for punitive damages it could and should have inserted a single provision stating 'this policy does not include recovery for punitive damages.' ").

¶ 115        Further, each of the policies used the plural noun "sums." "Sum" is defined as "[a]n amount obtained as a result of adding numbers," "[t]he whole amount, quantity, or number; an aggregate," and "[a]n amount of money." *Sum*, *The American Heritage Dictionary* (5th ed. 2018); *see also Sum*, *New Oxford American Dictionary* (3rd ed. 2010) (defining "sum" as "a particular amount of money," "the total amount resulting from the addition of two or more numbers, amounts, or items," "the total amount of something that exists," and "an arithmetical problem, esp. at an elementary level"). Given these definitions, the plain meaning of the term "sum" or "sums" alone does not contemplate a fractional or proportional share. Simply put, "sums" may entail addition—but not addition followed by division. The adjectives qualifying "sums,"

"all" and "those," also confirm a meaning antithetical to fractional or proportional. *See, e.g.*, *All*, *The American Heritage Dictionary* (5th ed. 2018) (defining the adjective "all" as "[b]eing or representing the entire or total number, amount, or quantity" among other definitions); *That*, *The American Heritage Dictionary* (5th ed. 2018) (defining the adjective "that," which in the plural is "those," as "[b]eing the one singled out, implied, or understood"). Thus, applying pro-rata allocation to the policies before us requires the Court to ignore the plain language of the term "sums."

¶ 116     While insurers could draft a proportional limitation, Radiator purchased policies with the language previously quoted, and the policy language does not contain such a limitation. *See Nat'l Indem. Co. v. State*, 2021 MT 300, ¶ 78, 406 Mont. 288, 499 P.3d 516 ("Pro rata allocation is a significant limitation on coverage, but is not expressly provided in the Policy, though it clearly could have been."). Given the policy language, if the insurers were "obligated to pay only a pro-rata share of [Radiator]'s liability, . . . [Radiator's] reasonable expectations would be violated." *See Keene*, 667 F.2d at 1047–48.

¶ 117     Additionally, all of the policies at issue extend coverage to "death resulting at any time." Such a provision reflects that the insurer agreed to and knew that it indemnified the insured's liability for death even if death did not occur during the policy period. This agreement is contrary to pro rata allocation, which spreads out liability for an insured's damages among multiple policies based on "time on the risk."

¶ 118     Nevertheless, the majority dismisses this as irrelevant because of the Court's holding that benzene exposure causes injury at the time of exposure, rather than a continuous injury. Yet, this Court's erroneous holding in this case as to the first issue should not necessitate an outcome on the second issue.

¶ 119     This Court should construe the policy language in accordance with the rules of contract interpretation and not read into the policies a pro rata allocation of coverage to which the parties did not agree contractually. To do so results in this Court redistributing the risk, taking from the insured for the benefit of the insurer and taking from some insurers for the benefit of other insurers. After all, insurers have the national and international re-insurance markets available to them to restructure their risks dynamics and cost-benefit analysis.

### C. Landmark's Duty to Defend

¶ 120     The final issue only involves Landmark's policies, which in pertinent part state:

> **2.** We will have the right and duty to defend any "suit" seeking those damages when:
>
> **a.** The applicable limits of insurance of the "underlying insurance" and other insurance have been used up in the payment of judgments or settlements; or
>
> **b.** No other valid and collectible insurance is available to the insured for damages covered by this policy.

¶ 121     "Underlying insurance" is a defined term, meaning "the policies or self[-

]insurance listed in the Schedule of Underlying Insurance." It is undisputed that the "underlying insurance" for Landmark's policies do not cover liability for the benzene claims. Thus, the applicable limits for the underlying insurance have *not* been used up in the payment of judgments or settlements. Since subparagraph (a) requires limits of underlying insurance to be used up to trigger the duty to defend, Landmark does not have a duty to defend pursuant to subparagraph (a).

¶ 122 Therefore, subparagraph (b) must be considered. To determine what encompasses "[n]o *other* valid and collectible insurance" as used in subparagraph (b), the meaning of "other insurance" as used in subparagraph (a) must be discerned. It is not a defined term. "Other insurance" could be interpreted to be insurance policies in effect for that policy year other than the "underlying insurance" or insurance policies for damages covered by Landmark's policy other than the "underlying insurance." Because the phrase "other insurance" in subparagraph (a) is not modified by the phrase "for damages covered by this policy" (unlike subparagraph (b)), "other insurance" is limited to policies in effect for that policy year.

¶ 123 "No *other* valid and collectible insurance" in subparagraph (b) must therefore refer to policies other than those in effect for that policy year.[3] Thus, subparagraph

---

[3] "The clause 'valid and collectible insurance' has widespread use in the insurance industry of the United States and has a well[-]established meaning. Generally, the clause refers to insurance which is legally valid and is underwritten by a solvent carrier." *Hellman v. Great Am. Ins. Co.*, 136 Cal. Rptr. 24, 27 (Cal. Ct. App. 1977).

(b) requires exhaustion of all policies covering damages also covered by Landmark's policy, but exhaustion is only required if such policy is valid and collectible. *See AAA Disposal Sys., Inc. v. Aetna Cas. & Sur. Co.*, 821 N.E.2d 1278, 1288–89 (Ill. App. Ct. 2005) (recognizing that a clause required horizontal exhaustion when any other valid and collectible insurance lacked language limiting it to certain policy periods). Thus, subparagraph (b) could apply even if the applicable limit of the "underlying insurance" or "other insurance" was not used up in the payment of judgments or settlements. Because the trial court did not determine whether "[n]o other valid and collectible insurance is available to the insured for damages covered by this policy," this Court should remand to the trial court.

### III.    Conclusion

"[B]ecause the insurance company is the party that selected the words used [in the policy]," "[t]his Court resolves any ambiguity in the words of an insurance policy against the insurance company." *Harleysville*, 364 N.C. at 9. It is not inequitable to hold an insurer to the words it selected; the words—the promise of indemnity—is what an insured purchased. The majority in this matter, for unclear reasons, construes language in the policy in favor of the insurers, regardless of the policy language. The holding in this case will deter entities and individuals who can self-insure from purchasing insurance (thus reducing the pool of insurance) and apparently requires the insured to sue and litigate with all their insurance providers

to receive the indemnity they purchased (or until forced to declare bankruptcy). Therefore, I respectfully concur in part and dissent in part.

Justice HUDSON joins in this concurring in part and dissenting in part opinion.